UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEFAN WINSTON,
    *Petitioner*,
    *v.*
UNITED STATES OF AMERICA,
    *Respondent.*

Civil No. 3:15cv1366 (JBA)

January 5, 2017

**RULING ON PETITIONER'S MOTION UNDER § 2255**

On August 16, 2011 Petitioner Stefan Winston pled guilty to one count of conspiracy to distribute one kilogram or more of heroin and twenty-eight grams or more of cocaine base in violation of 21 U.S.C. § 846 and 841(a)(1) and 841(b)(1)(A). On January 28, 2013 he was sentenced to 165 months' imprisonment followed by five years of supervised release. Mr. Winston unsuccessfully appealed his conviction and sentence to the Second Circuit.[1] *See United States v. Winston*, No. 13-1093, Summary Order [Doc. # 193] at 5.

Mr. Winston now moves [Doc. # 1] to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255 claiming that his defense counsel was ineffective in two respects: he failed to address "disparities in the sentencing procedure resulting in additional jail time" for Mr. Winston in relation to his co-defendants; and he neglected to inform Mr. Winston of an earlier, more favorable plea offer from the Government, which he would have accepted had he known of it. (Pet'r. Mem. Supp. [Doc. # 3] at 2.) The Court rejected [Doc. # 12] his claim that his defense counsel failed to meaningfully address sentencing disparities between him and his co-defendants,

---

[1] Mr. Winston subsequently filed a motion to reduce his sentence to 151 months under Amendment 782 to United States Sentencing Guidelines, which was granted [Doc. # 809] on January 21, 2015.

but ordered an evidentiary hearing on the second claim that Petitioner's counsel failed to communicate to him the terms of an earlier, more favorable plea offer than the one under which he pled guilty. That evidentiary hearing was held September 26, 2016. For the reasons discussed below, Mr. Winston's motion is granted.

I.  Discussion

Petitioner claims that his attorney never conveyed to him the Government's first plea offer which would have subjected him to a sixty-month mandatory minimum sentence on a charge of conspiracy to distribute and to possess with intent to distribute mixtures and substances containing twenty-eight grams or more of cocaine base. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Instead, he pled guilty to a charge of conspiracy to distribute and possess with intent to distribute both the aforementioned cocaine *and* mixtures and substances containing one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B) and 846, which carried a 120-month mandatory minimum sentence.[2] The Government maintains that Mr. Winston was aware of this first plea deal and made a conscious decision to opt for the second agreement. Thus, the critical fact on which the evidentiary hearing was focused was whether Petitioner proved by a preponderance of the evidence that defense counsel for Mr. Winston during the relevant time period failed to inform his client of the initial plea agreement before Mr. Winston entered into the second agreement.

---

[2] Neither the initial proposed agreement, nor the agreement to which Mr. Winston ultimately pled were binding plea agreements under Fed. R. Crim. P. 11(c)(1)(c).

2

### a. Legal Standard

Prisoners in federal custody may seek to have their sentences vacated, set aside, or corrected if their "sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

A claim of constitutionally ineffective assistance of counsel at the plea negotiation stage is governed by *Missouri v. Frye*, which recognizes that the two-pronged standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984) applies. *See Frye*, 132 S. Ct. 1399, 1405 (2012). Under this standard, a petitioner must prove that: (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "any deficiencies in counsel's performance [were] prejudicial to the defense." *Strickland*, 466 U.S. at 688, 692. Because under the Sixth Amendment, defense counsel has an affirmative duty "to communicate the terms of a formal offer to accept a plea on terms and conditions that may result in a lesser sentence, a conviction on lesser charges, or both," the failure to do so may constitute ineffective assistance of counsel. *Frye*, 132 S. Ct. at 1405. In assessing such claims a court "must be highly deferential" to counsel and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

To demonstrate prejudice

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012). "[A]ny [increase in the] amount of actual jail time" may constitute prejudice. *Glover v. United States*, 531 U.S. 198, 203 (2001) ("Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

### b. Evidence Related to Counsel's Communications With Mr. Winston Regarding the First Plea Agreement

#### i. Undisputed Facts

On January 5, 2011 Mr. Winston was indicted on one count of conspiracy to distribute and to possess with intent to distribute narcotics (one kilogram or more of a mixture and substance containing a detectable amount of heroin and twenty-eight grams or more of a mixture and substance containing a detectable amount of cocaine base) and one count of conspiracy to maintain a drug-involved premise within 1,000 feet of a school and a housing facility.[3] Indictment [Doc. # 1], U.S.A v. Reyes et. al., No. 3:11-CV-1 (MRK) (D. Conn. Jan. 5, 2011). Counsel was appointed to represent Mr. Winston under the Criminal Justice Act (CJA). Beginning in May 2011 Mr. Winston and his counsel engaged in several proffer sessions with the Government. (*See* Pet'r.

---

[3] The grand jury subsequently returned a Superseding Indictment on February 1, 2011 adding three counts against Mr. Winston: a substantive count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(1); and possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). A Second Superseding Indictment merely added two more defendants to the conspiracy charges in Counts One and Two but did not affect Mr. Winston's charges. Mr. Winston ultimately pled guilty to Count One of the Second Superseding Indictment. (*See* Gov't. Mem. [Doc. # 8] in Opp'n to Pet'r. 2255 Mot. at 3.)

4

Ex. 3 at 6-7.)[4] On August 16, 2011 Mr. Winston entered a guilty plea before the late Honorable Mark R. Kravitz. *Id.* [Doc # 199]. At that time he formally entered into a cooperation agreement with the Government. (*See* Pet'r. Ex. 4 at 1.)

The plea agreement pursuant to which Mr. Winston pled, dated August 10, 2011 (the "August Agreement") (Pet'r. Ex. 2), required him to "agree[ ] to plead guilty to knowingly, intentionally and unlawfully conspiring to possess with intent to distribute, and to distribute, mixtures and substances containing 1 kilogram or more of heroin a Schedule I controlled substance and 28 grams or more of cocaine base, a Schedule II controlled substance" in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. (*See* Pet'r. Ex. 2.) The plea agreement set out the mandatory minimum sentence of ten years' (120 months) imprisonment but contained no reference to the relevant Sentencing Guidelines range.[5] Mr. Winston was offered this deal in contemplation of his agreeing to be a cooperating witness for the Government, although the two agreements were not facially interdependent. (*See* Pet'r. Ex. 4 at 2.)

This case was transferred to the undersigned on May 16, 2012, and in connection with Mr. Winston's sentencing hearing, Defense Counsel filed his Memorandum in Aid of Sentencing, which informed the Court that "the first drafts of plea agreements between the Defendant and the Government only dealt with the cocaine base sales [and] it was in fact Defendant's counsel who suggested that if his client were to be credible as a cooperator his plea agreement should include a

---

[4] All exhibits cited in this decision refer to the exhibits introduced at the evidentiary hearing held on September 26, 2016.

[5] At sentencing, the Court determined the applicable Guidelines range for Mr. Winston to be 188 to 235 months, including a two-level reduction for acceptance of responsibility under Section 3E1.1, and a two level enhancement under Section 2D1.1(b)(1) for possession of a firearm. (*See* Pet'r. Ex. 5 at 7, 21-22.)

5

recognition on his part of the workings of the entire membership." (Pet'r. Ex. 4 at 2.) At Defendant's sentencing hearing Defense Counsel further explained:

> When this plea agreement was initially beg[u]n to be negotiated with the government, we were approached with a plea agreement that had only cocaine base in it, and at that point my client had entered into a proffer agreement, I believed we were on the road to cooperation, and quite frankly, and I need to admit it, I went back to the government and said, in terms of just discussing this, you are asking my client to potentially have to testify at trial against co-defendants, members of this gang, the indictment mentions both heroin and cocaine base, wouldn't it put my client – never thinking it was going to fall apart – in a better light if both narcotic substances were mentioned in our plea agreement, which had the effect of putting him up to a mandatory minimum 120 months and starting off at a much higher level.[6]

Thus, it is clear that there was an earlier plea offer extended by the Government before the August Agreement. The primary factual dispute is whether Mr. Winston was aware of that plea offer before he signed the August Agreement, after which "the [cooperation] arrangement with Mr. Winston [broke] down" (Pet'r. Ex. 5 at 27-28) and the Government ultimately refused to file a § 5k1.1 motion on his behalf such that the Court was bound by the ten-year statutory mandatory minimum (*see* Pet'r. Ex 4 at 10).

### ii. The Evidentiary Hearing

At the evidentiary hearing both Mr. Winston and his former attorney testified. Among the records admitted was a copy of what both parties agree is the earlier plea agreement, dated June 15, 2011 (the "June Agreement") (Pet'r. Ex. 1), which Petitioner claims was never presented to

---

[6] In actuality, as discussed in more detail *infra*, because of the differences between the agreements in the quantity of crack cocaine foreseeable to him, Mr. Winston's base offense level was higher under the first agreement, at 34, than under the agreement to which he pled, which was determined at sentencing to be 32.

6

him.[7] This Agreement, in contrast with the August Agreement, would have had Mr. Winston agree "to plead guilty to knowingly, intentionally and unlawfully conspiring to possess with intent to distribute, and to distribute, mixtures and substances containing 28 grams or more of cocaine base, a Schedule II controlled substance." (*See id.*) The offense charged in the June Agreement carried a mandatory minimum of sixty months (five years) as opposed to the 120-month (ten-year) minimum in the August Agreement.[8] Mr. Winston testified that he never learned of the existence of the June Agreement until just before his sentencing hearing, well after he pled guilty on August 16, 2011.

        1. *Defense Counsel has no Specific Recollection of Reviewing the June Agreement With Mr. Winston and the Records do not Confirm That he did so*

Significantly, at the hearing Defense Counsel was unable to state with any certitude that he had actually reviewed the proposed June Agreement with his client and in fact testified that he had no specific recollection of reviewing that Agreement with Mr. Winston.[9] He explained that his

---

[7] The Agreement begins, "[t]his letter confirms the plea agreement entered into between your client, Stefan Winston . . . and the United States Attorney's Office for the District of Connecticut . . . concerning the referenced criminal case." (Pet'r. Ex. 1.)

[8] The Guideline range referenced in the June Agreement was 210-262 months' imprisonment (level 33), based on Mr. Winston's stipulation that the "quantity of cocaine base involved in the conspiracy offense which was readily foreseeable was approximately 1 kilogram" (Pet'r. Ex. 1), his Criminal History, and taking into account an offense level reduction under U.S.S.G. § 3E1.1 of three levels and a two level enhancement for possession of a firearm, both of which were included in the June Agreement. (*See* Pet'r. Ex. 1.)

[9] In Defense Counsel's affidavit [Doc. # 9], submitted as an exhibit to the Government's response to Petitioner's § 2255 motion, Counsel states "I did in fact meet with [Mr. Winston] that day for the purpose of reviewing and discussing the proposed plea agreement. I did cover with Mr. Winston the contents of the proposed plea agreement." (Ex. [Doc. # 9] to Gov't. Mem. in Opp'n

practice after receiving a plea agreement from the Government was to review it himself and then with the client. Thus, he testified that despite having no precise memory of reviewing the June Agreement, he believes he did so in this case, especially because his CJA compensation voucher included an entry for 1.3 hours on June 26 with the notation "Meeting with Client re; Plea agreement."[10] (*See* Pet'r. Ex. 3 at 6.)[11] Nonetheless, his CJA worksheet and corresponding notes relating to the June Agreement differ somewhat in their detail compared to those pertaining to the August Agreement.[12]

Counsel's entry for August 12, 2011 reads, "[m]eeting with Client to review plea agreement and wait time." (Pet'r. Ex. 3 at 7.) Counsel's description in this entry of his purpose "to review" the August Agreement with Mr. Winston, coupled with the accompanying notes for that meeting,

---

to Pet'r. 2255 Mot. ¶ 6.) Presumably, Counsel based this statement solely on his billing record notation, and not any actual recollection.

[10] It was not Counsel's practice to take extensive notes during meetings with clients according to his testimony.

[11] The Court refers to the page numbers on the top right hand corner of this exhibit. It should be noted that the first page is identified as page two out of ten. So, for example, the Court will refer to this as page two.

[12] According to the compensation sheet, there had been two proffer sessions with the government prior to the June 26 meeting between Mr. Winston and his attorney, and an entry for June 14 denotes a telephone call between Defense Counsel and AUSA Morabito "re; Plea." (Pet'r. Ex. 3 at 6.) The June Agreement is dated the following day, June 15. At the hearing Defense Counsel testified that he recalled ongoing discussion and emails between him and AUSA Morabito over the course of the summer that resulted in "the final plea agreement," which he identified as being the August Agreement. This context supports an inference that Defense Counsel did not view the June Agreement as the final agreement, lending some credence to the Petitioner's claim that he did not review it with Petitioner as discussed *infra*.

which lasted about two hours,[13] and which reiterate his "review" of the Agreement with Mr. Winston, ("visit w client review plea/cooperation") provide a basis for inferring that an attorney-client plea agreement review actually took place at that time. (Gov't. Ex. 2.)

Defense Counsel's lack of specific present recollection of the details of his representation of Mr. Winston over five years ago is not surprising given the large number of defendants he has represented and plea deals he has negotiated over his decades-long career.[14] However, the evidence of the existence of two significantly different plea offers reflects an unusual circumstance because peculiarly, Defense Counsel was advocating for a more serious crime of conviction than had been originally offered to his client, clearly anticipating a strong 5k1.1 motion to support a substantial downward departure at sentencing below the statutory ten-year mandatory minimum, notwithstanding the reality that the decision to file one rested solely with the Government.[15] Under these circumstances, if Mr. Winston had been presented with the first plea agreement and thereafter with a second one at the August meeting with Counsel carrying a mandatory minimum twice as high, convincing him to relinquish the first and take the second offer would seem to be a

---

[13] Although the entry on the compensation worksheet says 2.5 hours, in his notes Counsel indicates that the actual duration of his visit with Mr. Winston was just under two hours, as he had to wait for about 40 minutes to meet with him. (*See* Gov't. Ex. 2.)

[14] At the hearing, Counsel testified that based upon his review of the sentencing memo he filed on behalf of Mr. Winston and the transcript of the sentencing hearing "it appears" to him that he approached the government and asked that the plea agreement reflect heroin in addition to crack in order to make Mr. Winston a more credible cooperating witness (but not anticipating the consequences to Mr. Winston if no Government 5k1.1 motion was ultimately forthcoming).

[15] At the evidentiary hearing, Defense Counsel testified he had hoped that by having Mr. Winston plead to the deal including heroin with the ten-year mandatory minimum, he would receive the benefit of a 5K1.1 motion to permit the Court to sentence Mr. Winston below that minimum.

very difficult sell. Moreover, such an unusual discussion with a client would likely have left Counsel with at least some lasting recollections about how he persuaded Mr. Winston to forego the earlier agreement with its five-year mandatory minimum.[16] Because Defense Counsel had no recollections about the August meeting, the Court infers that it was a routine, non-memorable meeting.

Significantly, there was no documentation or testimony that Mr. Winston had reviewed the June Agreement but rejected it, nor any indication in the records of his attorney communicating the rejection of that deal to the Government, or of the Government having withdrawn that offer.[17] Instead, Defense Counsel's lack of recollections and the dearth of any evidence about any reaction by Mr. Winston to the June Agreement weighs in Mr. Winston's favor

---

[16] In their briefing and at the evidentiary hearing, both parties focused on the question of whether Mr. Winston's attorney informed him of the June Agreement prior to his pleading to the August Agreement, and did not discuss the issue of prejudice. Thus, they seemed to be in agreement that the first plea offer was more favorable to Mr. Winston despite the fact that the sentencing range in the June Agreement was actually higher than the August Agreement, presumably because it preserved far broader sentencing discretion for the Court, given the lower mandatory minimum. That view is consistent with the actions of the attorneys for both Mr. Winston and the Government, who proceeded to formulate a second plea agreement that contained both cocaine base and heroin, and carried the higher mandatory minimum, in anticipation of Mr. Winston testifying at trial. The Court addresses the question of whether the first offer was in fact more favorable in more detail *infra* at page 13, in the section discussing prejudice.

[17] Between June 15, the date marked on the June Agreement, and August 12, when Defense Counsel and Mr. Winston reviewed the August Agreement, Counsel's compensation sheet includes entries relating to: a telephone call on June 27 to AUSA Morabito "re plea"; a telephone call and email to AUSA Morabito lacking any notation as to their subject matter; a notation to "e-mail new agreement to AUSA Morabito"; and another telephone call with AUSA Morabito of which the topic is unknown. (*See* Pet'r Ex. 3 at 6-7.)

as support that the June Agreement was not reviewed with him such that he ever had the opportunity to accept or reject it.

### 2. *Mr. Winston Testified he did not see the June Agreement Until Shortly Before his Sentencing Hearing*

Neither Defense Counsel's testimony nor the records relating to his representation of Mr. Winston confirm or dispute whether the June Agreement was explained to Mr. Winston. Indeed, the only individual who spoke with any certainty regarding that critical fact was Mr. Winston, who unequivocally denied having ever known about, much less reviewed the June Agreement with his attorney before accepting the August Agreement. Petitioner responded affirmatively and decisively to the Assistant United States Attorney's question on cross examination of whether, sitting at the evidentiary hearing, under oath, he could state definitively that his attorney had never advised him of the first plea agreement prior to his guilty plea before Judge Kravitz.

Mr. Winston testified that he first found out there had been an earlier plea offer while preparing for sentencing, well after he pled guilty under the August Agreement, when his attorney told him that the Government was not going to use him as a cooperating witness. He testified that it was only after he questioned how his co-defendants had managed to receive sentences shorter than the ten-year mandatory minimum that his attorney told him of the existence of the June Agreement. Mr. Winston explained that he did not raise the issue of the earlier agreement prior to his sentencing hearing because his attorney had assured him that he would admit to the Court at sentencing that it had been his idea and upon his encouragement that the Government include heroin, and thus the associated ten-year mandatory minimum, in order to enhance Mr. Winston's

trial credibility as to his knowledge about the broad drug conspiracy.[18] Mr. Winston's recollection of this conversation with his attorney about the June Agreement is that Defense Counsel informed him that there had been an earlier plea offer made, but that Counsel felt obligated to make Mr. Winston more credible to a jury, and consequently asked that the Government include heroin in the plea offer, resulting in the August Agreement.

Mr. Winston's testimony was logical and credible, despite his obvious self-interest in so testifying. Mr. Winston was clear that, putting aside the failure to communicate the earlier plea deal, he was satisfied with his attorney's representation of him in all other respects. His explanation as to why he said nothing prior to the sentencing hearing is consistent with the record, as Counsel did in fact acknowledge to the Court that he was responsible for the inclusion of heroin in the second plea agreement. Moreover, common sense corroborates the credibility of Mr. Winston's testimony that if he had had the choice between an agreement containing a mandatory minimum

---

[18] In fact, true to his word, Counsel did make this representation to the Court, both in his sentencing memorandum and at the sentencing hearing. However, as noted in this Court's May 4, 2016 Order [Doc. # 12] Denying in Part Petitioner's § 2255 Motion, Defense Counsel's statement at the sentencing hearing informing the Court about the earlier agreement does not establish that Mr. Winston was earlier aware of the June Agreement, only that his attorney was. (See Order [Doc. # 12] Denying in Part Petitioner's 2255 Motion at 4.) Contrary to the Government's contention, Mr. Winston's failure to speak up at the hearing to inform the Court that he had not previously been told of the June Agreement is not, in the Court's view, probative of his knowledge of that earlier agreement. (See Gov't. Mem. in Opp'n to Pet'r. 2255 Mot. at 14-15.) Unfortunately, since a ten-year mandatory minimum would still bind the Court without any 5k1.1 motion from the Government, Defense Counsel's statements would not mitigate the prejudice resulting from Mr. Winston's not having an opportunity to choose a plea offer with only a five-year minimum.

of only five years and one with a ten-year mandatory minimum, he would have chosen the former.[19]

The Court concludes that Petitioner has met his burden of proving by preponderance of the evidence that defense counsel did not communicate the substance of the June 15, 2011 plea agreement to his client before he accepted the subsequent August 10, 2011 agreement.

### c. Petitioner met his Burden Under the *Strickland* Test

It is undisputed that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," *Frye*, 132 S. Ct. at 1408, and counsel's failure to do so falls below *Strickland's* objective standard of reasonableness, *id.* at 1410. The Court has found that the evidence shows that Defense Counsel, more likely than not, failed to inform Mr. Winston of the existence of the June Agreement prior to having Mr. Winston plead guilty to the August one. Such conduct, no matter how well intentioned, falls below an objective reasonableness standard in satisfaction of *Strickland's* first prong. 466 U.S. at 688.

In order to satisfy the second prong, that Mr. Winston was prejudiced, he must demonstrate that there is a "reasonable probability" that the June Agreement would have been

---

[19] Here Mr. Winston truly would have had a choice. The record indicates that the only reason he might have rejected the June Agreement would have been because his attorney persuaded him of the benefits of the second deal. Thus, he would have had to have understood and followed the advice of his counsel that he would be better off with the August Agreement than the June Agreement, which would have required a deft sales pitch by Defense Counsel (one which he has no memory of giving). Upon questioning from the Court, even the Government acknowledged that logic dictates that faced with the choice between pleading to an agreement with a mandatory minimum of five years, or a mandatory minimum of ten years, it would not take much reasoning to choose the former. The record contains no support for concluding that Mr. Winston had been so persuaded.

presented to, and accepted by, the Court and that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *See Lafler*, 132 S. Ct. at 1385. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, but . . . a defendant *need not* show that counsel's deficient conduct *more likely than not* altered the outcome in the case." *Gonzalez v. United States*, 722 F.3d 118, 135 (2d Cir. 2013) (quoting *Strickland,* 466 U.S. at 693) (emphases added). With respect to the first requirement, Mr. Winston credibly testified that had the June Agreement been presented to him in connection with the charges against him, together with a cooperation agreement, he would have pled guilty pursuant to that Agreement.[20] Furthermore, Defense Counsel testified that he has no reason to believe that had Judge Kravitz been presented with the June Agreement he would have rejected it, nor was there any testimony or evidence that the Government would have withdrawn the June Agreement.

Consequently, the sole remaining question is whether either "*the conviction or sentence, or both*, under the [June Agreement] would have been less severe than under the judgment and sentence that in fact were imposed" pursuant to the August Agreement. *See Lafler,* 132 S.Ct. at 1385 (emphasis added); *see also Frye,* 132 S. Ct. at 1409 (In order to establish prejudice, a defendant must "show a reasonable probability that the end result of the criminal process would have been

---

[20] The record indicates, and Defense Counsel testified, that Mr. Winston was already in discussions with the Government about cooperating at the time the June Agreement was drafted. The record further indicates that he would have been amenable to pleading guilty at that time and that some form of cooperation was likely. In further support thereof, Mr. Winston later pled to an agreement containing a more severe charge with a mandatory minimum twice the length of that in the June Agreement, giving significant credence to Mr. Winston's testimony that he would have entered into the June Agreement had it been presented to him.

14

more favorable b*y reason of a plea to a lesser charge or a sentence of less prison time*) (emphasis added). The question of prejudice is made difficult by the fact that the June Agreement, due to the weight of cocaine base included, carried an advisory Guidelines sentencing range that was twenty-two to twenty-seven months longer than the applicable range under the August Agreement; but nonetheless, several facts persuade the Court that Mr. Winston was prejudiced by not having been presented with the earlier Agreement.

First, the explicit use of the word "or" in both *Lafler* and *Frye* implies that a defendant can establish prejudice by showing that he would have been convicted of a less severe charge, even where that lesser charge does not result in a less severe sentence. Here, Mr. Winston pled guilty under an Agreement which resulted in him being convicted of violating 21 U.S.C. § 841(b)(1)(A), carrying a mandatory minimum twice the length of the mandatory minimum under § 841(b)(1)(B), the Section under which he would have been convicted under the June Agreement. Moreover, by pleading to the August Agreement, Mr. Winston agreed that he was responsible for selling not only cocaine base, but heroin as well, a more serious charge. These facts support this Court's conclusion that Mr. Winston has established that he was convicted of what is undoubtedly a more severe crime than he would have been had he entered the June Agreement, notwithstanding the higher advisory Guideline sentencing range in that earlier offer.

Second, at sentencing the Government refused to move for the third point for acceptance of responsibility under 3E1.1 and sought a sentence of 235 months, at the top of the guideline range. (*See* Pet'r. Ex. 5 at 20-21, 58.) Counsel for the Government admitted at the evidentiary hearing that the Government's view of Mr. Winston at the sentencing stage was likely negatively colored because Mr. Winston "couldn't ultimately just be forthright and accept the fact that he also did the heroin sales." The Court, in its review of the sentencing transcript and record as a whole,

15

concludes that its perception of Mr. Winston was similarly negatively impacted because of the sequence of events stemming from the inclusion of heroin in the final Agreement. The Court finds that there is a reasonable probability that had Mr. Winston instead pled to the June Agreement with only cocaine base, the Government's harsh stance on his sentence would have been substantially softened, shifting the tone of the entire sentencing hearing and casting Mr. Winston in a less negative light.

Relatedly, without heroin in the plea agreement, Mr. Winston's sentencing argument for parity with his co-defendants who were convicted only of charges involving crack would likely have found more perch. Mr. Winston's attorney argued extensively in his Memorandum in Aid of Sentencing and at sentencing that the Court should grant a downward departure from the Guidelines because Mr. Winston faced "a higher guideline exclusively due to his cooperation with the Government." (Pet'r. Ex. 4 at 14.) The basis of this argument is that because Mr. Winston, in an effort to make himself a more credible Government witness, "acknowledge[d] not only what he was personally involved with but also the drugs and quantities of other members of the conspiracy," he started off with a higher Guidelines range than did his co-defendants.[21] (*Id.*) The Court did ultimately credit Mr. Winston somewhat for his attempted cooperation by sentencing him below the Guideline range. However, there is a reasonable probability that Mr. Winston would also have received that credit for cooperation efforts had he entered the June Agreement, and that

---

[21] This argument applies with equal force under the June Agreement, given the large quantity of cocaine base for which Mr. Winston would have accepted responsibility.

absent the issues related to his equivocation about the heroin, his sentence would have been lower than the 165 months he received.[22]

Finally, although the comparative advisory Guidelines ranges were oddly inversely related to the types of drugs involved, with the Agreement that included heroin resulting in a lower Guideline range than the one that did not due to the respective quantities of the cocaine base, the stipulated Guidelines range for the June Agreement was significantly longer than would have been necessary to meet the goals of sentencing and a non-Guidelines sentence would likely have been considered, with an appropriate sentence being somewhat less than the 165 months imposed.

While the Court acknowledges that the higher sentencing range associated with the June Agreement makes the question of prejudice an especially interesting one, the simple fact that Mr. Winston received a conviction that was more severe than he would have under the initial Agreement is sufficient to constitute prejudice. *See Lafler*, 132 S.Ct. at 1385; *Frye*, 132 S. Ct. at 1409. Additionally, because even "a minimal amount of additional time in prison [can] constitute prejudice," Mr. Winston has established a reasonable probability that his sentence was longer than it would have been under the June Agreement, also meeting the standard for prejudice. *See Glover*, 531 U.S. at 203; *see also Morales v. United States*, No. 3:12-CV-0194 MPS, 2014 WL 7369512, at *11 (D. Conn. Dec. 29, 2014) ("[w]hen a petitioner can demonstrate a reasonable probability that his sentence was increased due to his counsel's errors, even relatively short increases in the ultimate

---

[22] For example, both co-defendants Ernest and Jonathan Williamson pled only to a limited quantity of cocaine base and did not cooperate. Ernest, with a Criminal History VI, one level higher than Mr. Winston's and an identical two-level enhancement for possession of a weapon, was sentenced to 151 months' imprisonment. His brother, Jonathan, who was not officially a member of the gang, had a Criminal History below that of Mr. Winston at Category III and was sentenced to 100 months' imprisonment.

sentence received will suffice to show *Strickland* prejudice."). This result seems particularly clear given the consequences that ensued as a result of having included heroin in the Agreement.

Because Petitioner met his burden under the *Strickland* test to prove that Defense Counsel's failure to timely communicate the June Agreement to him both falls below an objective reasonableness standard and is prejudicial to Mr. Winston, he is entitled to have his sentence vacated, set aside, or corrected under 28 U.S.C. 2255.

## II.     Conclusion

For the foregoing reasons, Petitioner's motion [Doc. #1] is GRANTED as to his claim of ineffective assistance of counsel for failure to communicate the terms of the first plea offer. Accordingly, his sentence is vacated and a resentencing hearing will be scheduled forthwith.

IT IS SO ORDERED.

      /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of January 2017.